# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

SHEREEN EDELSON, *et al.*,
     Plaintiffs,

     v.

CHAPEL HAVEN, INC., *et al.*,
     Defendants.

No. 3:15-cv-1862 (SRU)

## RULING AND ORDER

On December 22, 2015, the plaintiffs, Shereen Edelson and Arnold Menchel, acting on their own behalf and also on behalf of their disabled adult son, Robert Menchel, filed this action. The complaint alleges that the defendants, Chapel Haven, Inc. and Michael Storz (collectively "the Chapel Haven defendants") and the Connecticut Department of Developmental Services ("DDS"), Mona Murray, the Connecticut Department of Social Services ("DSS"), and Roderick Bremby (collectively, "the State defendants"), violated various state and federal laws when they terminated Robert's access to care at Chapel Haven. (doc. 1) On March 15, 2015, both sets of defendants filed motions to dismiss the complaint. (docs. 25, 26) In response, the plaintiffs filed an amended complaint on April 4, 2016 (the "complaint" or "amended complaint"). (doc. 29) The State defendants move to dismiss portions of the five counts against them for lack of subject matter jurisdiction and move to dismiss the remainder for failure to state a claim. (doc. 34) The Chapel Haven defendants move to dismiss eleven of the fifteen claims against them for failure to state a claim. (doc. 32)

For the following reasons, the defendants' motions are **granted in part and denied in part**.

## I.      Standard of Review

### A.  Motion to Dismiss for Lack of Subject Matter Jurisdiction

The party who seeks to invoke a court's jurisdiction bears the burden of establishing that

jurisdiction. *Thompson v. Cnty. of Franklin*, 15 F.3d 245, 249 (2d Cir. 1994) (*citing Warth v.

Seldin*, 422 U.S. 490, 518 (1975)). To survive a motion brought under Rule 12(b)(1), a plaintiff

must allege facts demonstrating that the plaintiff is a proper party to seek judicial resolution of

the dispute. *Id.*

### B.  Motion to Dismiss for Failure to State a Claim Upon Which Relief May Be Granted

A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) is designed

"merely to assess the legal feasibility of a complaint, not to assay the weight of evidence which

might be offered in support thereof." *Ryder Energy Distribution Corp. v. Merrill Lynch

Commodities, Inc.*, 748 F.2d 774, 779 (2d Cir. 1984) (quoting *Geisler v. Petrocelli*, 616 F.2d

636, 639 (2d Cir. 1980)).

When deciding a motion to dismiss pursuant to Rule 12(b)(6), the court must accept the

material facts alleged in the complaint as true, draw all reasonable inferences in favor of the

plaintiffs, and decide whether it is plausible that plaintiffs have a valid claim for relief. *Ashcroft

v. Iqbal*, 556 U.S. 662, 678–79 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007);

*Leeds v. Meltz*, 85 F.3d 51, 53 (2d Cir. 1996).

Under *Twombly*, "[f]actual allegations must be enough to raise a right to relief above the

speculative level," and assert a cause of action with enough heft to show entitlement to relief and

"enough facts to state a claim to relief that is plausible on its face." 550 U.S. at 555, 570; *see also

Iqbal*, 556 U.S. at 679 ("While legal conclusions can provide the framework of a complaint, they

must be supported by factual allegations."). The plausibility standard set forth in *Twombly* and

*Iqbal* obligates the plaintiff to "provide the grounds of his entitlement to relief" through more than "labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555 (quotation marks omitted). Plausibility at the pleading stage is nonetheless distinct from probability, and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of [the claims] is improbable, and . . . recovery is very remote and unlikely." *Id.* at 556 (quotation marks omitted).

## II.     Background

The following facts are taken from the amended complaint. Robert Menchel is an intellectually and developmentally disabled adult. Am. Compl. at ¶ 8. Shereen Edelson and Arnold Menchel are Robert's parents, guardians, and the co-conservators of his estate. *Id.* at ¶ 9. Chapel Haven provides services to developmentally disabled adults, and Michael Storz serves as the president of Chapel Haven. *Id.* at ¶¶ 10–11. DSS is the agency designated with ensuring Connecticut's compliance with Medicaid requirements. *Id.* at ¶ 12. DSS has delegated to DDS the provision of home and community-based services for Medicaid recipients. *Id.* at ¶¶ 13, 51. Brembly and Murray are the respective Commissioners of DSS and DDS, and have been named only in their official capacities. *Id.*

Chapel Haven markets itself as offering a "unique" program of lifelong and individualized services. *Id.* at ¶¶ 22–23. In its Community Member Handbook, Chapel Haven states that it provides a lifelong program of care. *Id.* at ¶ 60. The Handbook also provides that members have the right to be free from abuse and discrimination, and would only be terminated for enumerated reasons. *Id.* at ¶¶ 64–65.

Robert has received services from Chapel Haven since 2000, and has participated in its Supported Living program since 2002. *Id.* at ¶ 27. Chapel Haven, through unidentified means and

3

at an unidentified time, represented to the plaintiffs that it would assist Robert in all aspects of his life as he grew older. *Id.* at ¶ 61. In 2011, the parent-plaintiffs purchased a condominium unit for Robert within walking distance of the Chapel Haven campus, because Robert is unable to drive. *Id.* The amended complaint does not state where Robert was living or how he was accessing the campus between 2000 and 2011. The parent-plaintiffs also live in close proximity to the Chapel Haven campus. *Id.* at ¶¶ 20–21.

Prior to his termination, Chapel Haven was providing Robert with 17 hours of individualized home support services and 22 hours of job support services per week. *Id.* at ¶ 28. Rosemary Williams, a Chapel Haven employee, provided Robert's home care services for over fourteen years. *Id.* at ¶¶ 29–34. Beginning in 2006, Robert worked for 20 hours a week at the naval base in Groton with the help of Chapel Haven's job support services, which included transportation to the base in a group van. *Id.* at ¶¶ 38, 40.

## A.  State Involvement in Robert's Care

The services that Robert received from Chapel Haven were paid for using federal funds through the Medicaid waiver program. *Id.* at ¶ 53. In order to receive payments from the Medicaid waiver program, Chapel Haven entered into an agreement with DDS to, *inter alia*, follow all requirements in the Waiver manual; obtain adequate information to meet the needs of the recipient; discharge a recipient only *after* review by an interdisciplinary team meeting and approval of the Regional Administration; and obtain prior approval from DDS before changing any support hours to any recipient. *Id.* at ¶ 59.

Pursuant to that agreement, the plaintiffs allege that DDS "actively participated and acted in concert with Chapel Haven" in two primary ways: (1) DDS was required to, and actually did approve of any changes to Robert's plan of care, including termination; and (2) Robert was

assigned a DDS case manager who worked jointly with Chapel Haven. *See id.* at ¶¶ 66–70. The plaintiffs allege that on several occasions, DDS also conducted investigations of Chapel Haven to ensure that it complied with federal regulations and issued several citations for failures to do so. *Id.* at ¶ 95.

B. Events Leading Up to Termination

Robert had previously formed a relationship with another Chapel Haven member, Client A. *Id.* at ¶ 71. Client A pays Chapel Haven privately for the services she receives instead of using Medicaid funding. *Id.* at ¶ 73. Chapel Haven makes more money from private paying members than Medicaid members. *Id.* Client A's parents have also donated substantial amounts of money to Chapel Haven. *Id.* at ¶ 74.

Client A developed an unhealthy attachment to Robert and exhibited serious behavioral problems including high levels of anxiety, temper tantrums, threats to a family pet, pounding on the walls of Robert's apartment, and persistent harassment of Robert. *Id.* at ¶¶ 76–80. The parent-plaintiffs repeatedly informed Chapel Haven about Client A's conduct and asked for assistance. *Id.* at ¶¶ 81, 89, 90. Chapel Haven failed to follow its internal complaint procedures or to properly supervise Client A. *Id.* at ¶ 91. Robert's DDS case manager also participated in meetings in which Client A's conduct was discussed, and informed the plaintiffs that another DDS case manager was managing Client A. *Id.* at ¶¶ 82–84. DDS did not take steps to control Client A. *Id.* at ¶ 86.

Client A's unchecked and increasing harassment interfered with Robert's ability to receive and benefit from individual home and job support services. *Id.* at ¶¶ 87–88. By late 2013, Client A had moved her belongings into Robert's condominium. *Id.* at ¶ 96. Robert's neighbors

repeatedly called the parent-plaintiffs to complain about Client A's disruptive conduct, and the plaintiffs, in turn, repeatedly requested that Chapel Haven and DDS intervene. *Id.* at ¶¶ 98–100.

Chapel Haven and DDS then implemented a "Code Red" procedure, in which Robert was instructed to call one of three Chapel Haven employees if Client A became disruptive. *Id.* at ¶ 101. The plaintiffs assert that the "Code Red" procedure was not practicable because Robert's disabilities would prevent him from being able to make that call, and that Chapel Haven and DDS would have known that the procedure had that flaw. *Id.* at ¶¶102–04. After the procedure was implemented, the plaintiffs repeatedly requested modifications to the procedure, including allowing others to initiate the procedure. *Id.* at ¶¶105, 109. Chapel Haven and DDS refused those requests. *Id.* at ¶ 110.

On August 6, 2014, while Robert's visiting nurse was administering his diabetes medications, Client A began provoking Robert. *Id.* at ¶¶ 115–16. The nurse told Client A to stop. *Id.* at ¶ 117. Robert became frustrated with Client A, and "an altercation followed." *Id.* at ¶¶ 118–19. The nurse then intervened to separate Robert and Client A. *Id.* at ¶ 120. Client A, however, refused to leave Robert's condominium for another five days. *Id.* at ¶ 123. The parent-plaintiffs wrote to Chapel Haven through counsel proposing a "collaborative approach" to removing Client A from the apartment. *Id.* at ¶ 124. Getting no response, they wrote a second letter threatening to "evict" Client A. *Id.* at ¶ 126. Although Chapel Haven did not respond, it did remove Client A and her belongings from the premises. *Id.* Sunny Richards, Chapel Haven's Director of Community Programs subsequently called Robert directly to confront him over the August 6 incident. *Id.* at ¶ 127. Robert was very distressed by the call. *Id.* at ¶ 128–29.

Beginning on August 15, 2014, as a result of the stress of the August 6 incident and its aftermath, Robert was hospitalized for seven days. *Id.* at ¶ 129. Prior to his discharge, a pre-

discharge meeting was held with Edelson, Robert's DDS case manager, the visiting nurse supervisor, the hospital psychiatrist, and Richards. *Id.* at ¶ 130. The psychiatrist recommended that Robert receive modifications to his supports and opined that Robert's hospital admission had been precipitated by Client A's conduct. *Id.* Richards again refused to change the Code Red procedure to allow others to initiate. *Id.* at ¶ 131.

Following Robert's discharge, the plaintiffs requested six specific modifications: (1) additional support hours; (2) that Roberts be dropped off from work at his condominium rather than on campus; (3) that the driver of the van ensure that Robert and Client A do not sit near each other in the van; (4) that Robert and Client A's support coordinators ensure that they do not run into each other at the supermarket; (5) allowing all competent authorities to contact Chapel Haven in the case of Client A's misbehavior; and (6) that Client A not be present at Robert's condominium. *Id.* at ¶ 132. The hospital supported those requests. *Id.* at ¶ 133. Chapel Haven did not directly respond to the parent-plaintiffs' requests. It did, however, provide additional support hours for two days, and began dropping off Robert directly at his condominium. *Id.* at ¶ 134–35.

C. Termination

On August 27, 2014, Chapel Haven notified the plaintiffs that it was terminating all services to Robert, banning him from the campus, and dismissing him from the Chapel Haven program as of October 1, 2014. *Id.* at ¶ 138. The plaintiffs assert that they were given no process and that the stated reason for termination was "false and pretexual" and inconsistent with the grounds for termination in Chapel Haven's Handbook, although they do not disclose what that reason was. *Id.* at ¶¶ 139–42.

Chapel Haven and DDS did not inform the plaintiffs of their right to have an interdisciplinary team meeting to review the termination, as provided in Chapel Haven's

7

Agreement with DDS, nor the right to seek a Programmatic Administrative Review ("PAR") with DDS, nor the right to a "fair hearing" under the Medicaid statute. *Id.* at ¶ 147. Nevertheless, the plaintiffs learned of their right to a PAR, and requested such a meeting. *Id.* at ¶ 148.

On October 1, 2014, a PAR was held. *Id.* at 149. It was attended by the plaintiffs and counsel, Robert's DDS case manager, Richards, and DDS employees and attorneys. *Id.* DDS employees apologized for miscommunications regarding five additional hours of support that had been authorized on September 30, 2014. *Id.* at ¶ 150. Chapel Haven agreed to make the requested modifications, and to continue providing services to Robert. *Id.* at ¶ 152–53. Chapel Haven also agreed to "next steps," including additional staff, a male mentor for Robert, a plan for the use of the additional hours, and exploration of counseling options. *Id.* at ¶ 154. The group agreed that it would reconvene in six to eight weeks. *Id.* at ¶ 155.

The next day, however, Storz contacted DDS without notifying the plaintiffs. *Id.* at ¶ 156. He stated that Chapel Haven would not make the modifications to which it had agreed, and would persist in terminating Robert's services. *Id.* He also made false statements about Robert's prior conduct and diagnoses, and asserted that the police should have been called about Robert's conduct with Client A. *Id.* at ¶¶ 157, 163.

It is unclear when or how Chapel Haven communicated its intent to persist in terminating Robert's services to the plaintiffs. The amended complaint suggests that Chapel Haven provided them with a statement of reasons insofar as it alleges that the reasons given are "false and pretextual," but it does not state what those reasons were. *See id.* at ¶ 165. It is also unclear to what extent Chapel Haven provided the agreed-upon modifications in the interim, because the complaint alleges that Robert did receive additional support hours before his termination. *See id.* at ¶ 186. The timeline is further confused by the plaintiffs' allegation that Williams, Robert's

8

long-time caregiver, was given only 24-hours' notice of her last day working with Robert. *See id.* at ¶¶ 35–37. That timeline appears to be inconsistent with the plaintiffs' allegation that DSS denied their request for a fair hearing to contest the termination in June 2015, *id.* at ¶ 11, but services were not actually terminated until August 1, 2015, *id.* at ¶ 184, giving Williams over a month's notice.

The termination has caused Robert to lose the support and services of Williams—who is effectively bound to Chapel Haven by a non-compete agreement—his job, his friends, and his access to the Chapel Haven campus and community. *Id.* at ¶¶ 189–91. He does not handle stress and change well, and has become isolated and depressed. *Id.* at ¶¶ 194–96. Client A, however, continues to receive services from Chapel Haven and also continues to harass Robert. *Id.* at ¶ 188.

## III.    Discussion

Taking up some preliminary matters, I first consider whether the State defendants engaged in "state action" and whether the Chapel Haven defendants were acting as "state actors," closely related issues that underpin many of the federal causes of action in the plaintiffs' complaint. I resolve some technical issues raised with respect to the parent-plaintiffs. I then consider the State Defendants' motions to dismiss portions of the complaint for lack of subject matter jurisdiction and for failure to state a claim. Finally, I consider the Chapel Haven defendants' motion to dismiss for failure to state a claim.[1]

---

[1] The plaintiffs also object to the defendants' inclusion of additional materials with their briefs. *See* Pls.' Opp'n Br. at 24–25. The only document I have considered here is the agreement between Chapel Haven and DDS. That agreement is referenced in, and could be considered "integral" to, the complaint. *See, e.g.*, Am. Compl. at ¶ 59. Moreover, the plaintiffs do not appear to challenge the authenticity or completeness of the form in which that document was provided.

A. <u>State Action</u>

1. *State Defendants*

Much of the State defendants' motion is premised on the argument that they were not sufficiently involved in Robert's care or in the termination decision to be held liable for those acts. *See, e.g.*, State Defs.' Br. at 19 (in the context of the adverse action requirement for the retaliation claim); 23 (in the context of the freedom of choice and fair hearing provisions of the Medicaid Act); 27–31 (same); 34–35 (in the context of the due process claim). That argument relies heavily on language in the amended complaint alleging that Chapel Haven "unilaterally terminated Robert's service," *see, e.g.*, Am. Compl. at ¶ 228; however, reading the complaint as a whole and drawing all reasonable inferences in favor of the plaintiffs, they have adequately alleged that the State defendants *were* responsible for decisions about Robert's care as active participants. The plaintiffs have alleged that DDS had a contractual right to review all changes to the care Chapel Haven provided to its members and to participate in termination proceedings. *See* Am. Compl. at ¶ 59. One can also reasonably infer from the complaint that DDS actually did exercise that supervisory responsibility—the complaint alleges that DDS representatives were present at the pre-discharge meeting where the August 21 modifications were discussed, *id.* at ¶ 130, as well as the October 1, 2014 PAR where the initial termination decision was reversed and additional modifications were proposed, *id.* at ¶ 149. More importantly, the amended complaint alleges that Storz contacted DDS to explain and justify his decision to proceed with the termination after the PAR meeting, *id.* at ¶ 156, from which one can infer that DDS then had the opportunity to approve or reject that decision.

The State defendants' reliance on *Blum v. Yaretsky*, 457 U.S. 991 (1982), and *Rovner v. Keystone Human Servs.*, 2013 WL 4016490 (M.D. Pa. Aug. 6, 2013), does not change that analysis. *Blum* lays out an analytical framework for determining whether a decision made by a

private actor may nevertheless constitute state action. *See* 457 U.S. at 1004–05. The *Blum* Court instructed that extensive regulation was not sufficient to create state action and a State would generally be liable for the decision of a private actor only when (1) "[the State] has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State;" or (2) "the private entity has exercised powers that are traditionally the exclusive prerogative of the State." *Id.* (quotation marks and citations omitted). The Court further observed that "[m]ere approval of or acquiescence in the initiatives of a private party is not sufficient to justify holding the State responsible." *Id.* Summarizing what would be required in the case at hand, Justice White wrote in his concurrence that the plaintiffs "must show that the transfer or discharge is made on the basis of some rule of decision for which the state is responsible." *Id.* at 1012 (White, J., concurring).

In both *Blum* and *Rovner*, the courts held there was no "state action" by a highly regulated private actor when the state agency had no contemporaneous role in the contested decision. *See Blum*, 457 U.S. at 1005 ("The decisions about which respondents complain are made by physicians and nursing home administrators, all of whom are concededly private parties."); *Rovner*, 2013 WL 4016490, at *1 ("It is undisputed that the Commonwealth defendants played no active role in any of these events."). By contrast, in the present case, the plaintiffs have alleged that the DDS *actually did* approve the termination decision before it went into effect, and indeed that Chapel Haven sought out DDS approval before termination. Moreover, in the words of Justice White, the plaintiffs have successfully pointed to the agreement between Chapel Haven and DDS as a "rule of decision" under which the State has the final word, and therefore the final responsibility, on termination decisions. In other words, the plaintiffs have alleged that the State's approval of their termination decision was not merely an

acquiescence, but actually an affirmatively *required* step in order for the termination to take place.[2] Thus, the plaintiffs have adequately alleged that the state actually engaged in "state action" when it affirmatively managed Robert's care and exercised its authority to approve the termination decision.

### 2.   *Chapel Haven Defendants*

The Chapel Haven defendants similarly devote many of their arguments to establishing that they are not "state actors," the flip-side of the State defendants' "state action" argument.

Under either section 1983 or the Fourteenth Amendment, the actions of a private entity are treated as state action when:

> (1) the entity acts pursuant to the "coercive power" of the state or is "controlled" by the state ("the compulsion test"); (2) when the state provides "significant encouragement" to the entity, the entity is a "willful participant in joint activity with the [s]tate," or the entity's functions are "entwined" with state policies ("the joint action test" or "close nexus test"); or (3) when the entity "has been delegated a public function by the [s]tate," ("the public function test").

*Sybalski v. Indep. Grp. Home Living Program, Inc.*, 546 F.3d 255, 257 (2d Cir. 2008) (quoting *Brentwood Acad. v. Tenn. Secondary Sch. Ath. Ass'n,* 531 U.S. 288, 296 (2001)).

The plaintiffs here rely solely on the joint action test, and allege that the Chapel Haven defendants can be considered state actors because they acted jointly with the State defendants to terminate Robert from their program. *See* Pls.' Opp'n Br. at 45–48. To be clear, the mere existence of the contract is not sufficient to convert Chapel Haven into a state actor. *See Phelan*

---

[2] Factual development could quickly undermine the plaintiffs' claims of state action here, particularly in light of the Supreme Court's holding in *Jackson v. Metro. Edison Co.*, 419 U.S. 345 (1974). In *Jackson*, the Court held that approval by a state utility commission of the specific practices of a regulated utility, although such approval was required by the regulatory scheme, did not turn the approved practice into "state action." *Id.* at 357. It reasoned that the approval signified only that the practice was a permissible option under state law, and distinguished circumstances where the commission "put its own weight on the side of the proposed practice by ordering it." *Id.* Thus, this claim could be dismissed on summary judgment if the State defendants present evidence that their role was purely perfunctory.

*ex rel. Phelan v. Torres*, 843 F. Supp. 2d 259, 273 (E.D.N.Y. 2011)*, aff'd sub nom. Phelan ex*

*rel. Phelan v. Mullane*, 512 F. App'x 88 (2d Cir. 2013) ("Although the state and private entities

might, by virtue of a contractual relationship, be engaged jointly in the general mission of caring

for abandoned children, only the *joint acts* of the private entity and the state are subject to

challenge as state action."). When applying the "joint action" test, courts routinely explain a

determination that the private entity is *not* a state actor by emphasizing that the state was not

involved in the specific decision at issue. *See, e.g.*, *Blum*, 457 U.S. at 1008; *Sybalski v. Indep.

Grp. Home Living Program, Inc.*, 546 F.3d 255, 259 (2d Cir. 2008) ("While the State of New

York has established *procedures* governing the limitations that mental health facilities place on

the ability of patients to receive visitors, the administrators of those facilities make the *decision*

about whether such limitations should be imposed.") (emphasis in original); *Schlein v. Milford

Hosp., Inc.*, 561 F.2d 427, 428–29 (2d Cir. 1977) (observing that the neither the state nor state

officials "contribute[d] material facts or information to the decisionmaking process or play[ed]

any other role in the decision"). Conversely, in the present case, as discussed above, the plaintiffs

have adequately alleged that the State defendants took action when they exercised their power to

pre-approve Robert's termination decision. Thus, when Chapel Haven carried out that

termination decision, the plaintiffs have adequately alleged that it was acting jointly with and as

the agent of the State.

   B. <u>Parent-Plaintiff Issues</u>

     1. *Parental Representative Standing*

    The State defendants challenge both the parent-plaintiffs' ability to bring suit on Robert's

behalf under all of the various roles identified in the amended complaint and their ability to

represent their child jointly.

With respect to the former issue, I note that the State defendants concede that the parent-plaintiffs have standing to bring the suit on Robert's behalf in their role as his "guardians." *See* State Defs.' Br. at 3 ("Neither DDS nor DSS challenge the plaintiffs in their capacity as guardian to bring suit on behalf of Robert."). Rule 17(c)(1)(A) permits a "general guardian" to sue on an incompetent person's behalf, and does not appear to put any limitations on that representation. Thus, it is unclear why permitting the parent-plaintiffs to sue under their additional roles (or not) would have any effect on this case, and I do not discuss the question further.

The State defendants also argue that only *one* of the plaintiff-parents may represent their son. As the State defendants point out, the Second Circuit has approvingly cited in dicta a 10th Circuit case as "stand[ing] for the (sound) proposition that only one party may act in a representative capacity with respect to an infant or incompetent who comes before the court." *Neilson v. Colgate-Palmolive Co.*, 199 F.3d 642, 650 (2d Cir. 1999) (citing *Garrick v. Weaver*, 888 F.2d 687, 693 (10th Cir. 1989)). The *Garrick* court, in turn, did not rely on binding legal authority but instead invoked policy considerations, observing that two guardians could interfere with the orderly development of the lawsuit by creating the potential for inconsistent positions. 888 F.2d at 693. Although that problem had actually been realized before the *Garrick* court, its concerns could apply with equal force in the present case. At the hearing on these motions, I instructed the parent-plaintiffs to designate one parent as the "primary" representative, whose views would be followed in the unlikely case of a dispute between them. Because the plaintiff-parents have not yet done so, I now order them to inform the court within thirty days of this Order which parent is the "primary" decision-maker in the context of this case.

2.   *Parental Standing for Associational Claims Brought on their Own Behalf*

Some language in the complaint suggests that the plaintiff-parents are bringing claims on their own behalf under Title II of the ADA, and several counts refer to harms suffered by the "Plaintiffs," suggesting that those counts were brought on behalf of Robert *and* his parents. At the hearing, however, the parent-plaintiffs clarified that the only claims brought on their own behalf are the Rehabilitation Act Claims in Counts One, Two, and Three of the complaint.

The Chapel Haven defendants challenge the parent-plaintiffs' ability to bring such claims. *See* Chapel Haven Defs.' Reply Br. at 1–2. The Second Circuit has held that associational claims are cognizable under the Rehabilitation Act if the plaintiffs can "establish that each suffered an injury independent from [the disabled person]" as a result of their association with a disabled person, and further show that the injury was "causally related to the denial of federally required services to the disabled person." *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 280, 282 (2d Cir. 2009) (Wesley, J. concurring, but writing for the majority for that portion of the ruling). In *Loeffler*, the plaintiffs alleged that they were required to provide a service that should have been provided by the hospital, and were subject to specific and personal emotional distress. *Id.* Given that *Loeffler* held additional caretaking tasks and emotional distress suffered by the care-giving family members to be sufficient, the Chapel Haven defendants have not shown as a matter of law that the plaintiff-parents will be *unable* to make an associational claim; however, thus far, the plaintiff-parents have alleged individual damages in a conclusory and vague manner, and they have not meaningfully alleged causation at all. *See* Am. Compl. at ¶¶ 198, 210, 223 (making vague claims about expenses, time expended, and unattributed emotional distress). I accordingly **grant** the motion to dismiss the plaintiff-parents' associational claims without prejudice to amending within thirty days of this Order.

C.  State Defendants' Rule 12(b)(1) Motion

The State defendants move to dismiss the ADA claims against them in Counts One, Two, and Three for lack of subject matter jurisdiction on sovereign immunity grounds.[3] *See* State Defs.' Br. at 6 –10 (headed "The Eleventh Amendment Bars the Claims for Monetary Damages under Title II of the ADA"). First, I note that the State defendants do not appear to be challenging those counts to the extent that they are brought under section 504 of the Rehabilitation Act, which expressly requires states to waive sovereign immunity as a condition of receiving federal funds. *Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn*, 280 F.3d 98, 113 (2d Cir. 2001).

Title II of the ADA has been held to validly abrogate sovereign immunity in certain circumstances.  *See United States v. Georgia*, 546 U.S. 151, 159 (2006) (sovereign immunity abrogated if both Title II and Fourteenth Amendment violations are shown); *Goonewardena v. New York*, 475 F. Supp. 2d 310, 323, 326 (S.D.N.Y. 2007) (sovereign immunity abrogated even without a specific constitutional violation because statute's penalty is a congruent and proportional response to the history of discrimination against the disabled).[4] The *Georgia* framework for determining whether a Title II claim can abrogate sovereign immunity asks a court to determine whether the plaintiff has shown both a Title II claim and a constitutional claim. It thereby functionally moves what would otherwise be a Rule 12(b)(6) argument that the plaintiff has failed to state a claim under the statute into Rule 12(b)(1) territory. As discussed below, I find that Robert has adequately alleged a Title II violation against the State defendants,

---

[3] The State defendants also argue that the Eleventh Amendment bars the recovery of monetary damages on all five counts in which the State defendants are named. The plaintiffs, however, appear to concede in their Opposition brief that they are not seeking monetary damages on Counts Four and Five, *see* Pls.' Opp'n Br. at 20.

[4] The Second Circuit has observed, but declined to formally endorse, the approach taken in *Goonewardena*; however, it appears to be commonly followed among the district courts. *See Dean v. Univ. at Buffalo Sch. of Med. & Biomedical Scis.*, 804 F.3d 178, 195 (2d Cir. 2015) (observing the use of that approach in some 2d Cir. district courts and in other circuits).

and accordingly, I conclude that sovereign immunity does not apply to bar the claim at this stage of the proceedings.

D.  State Defendants' Rule 12(b)(6) Motion (doc. 34)

1.  *Count One – Discrimination Under ADA and Rehabilitation Act*

The plaintiffs claim that the State defendants discriminated against Robert in violation of both Title II of the ADA, 42 U.S.C. § 12132, and section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a). In *Henrietta D. v. Bloomberg*, 331 F.3d 261 (2d Cir. 2003), the Second Circuit provides a useful introduction to those two statutes:

> The ADA was enacted to "provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1) (2000). Its first three titles proscribe discrimination against individuals with disabilities in employment and hiring (Title I), access to public services (Title II), and public accommodations (Title III). . . . Section 504 of the Rehabilitation Act similarly provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a) (2000).
>
> As the District Court [in that case] correctly noted, "[a]lthough there are subtle differences between these disability acts, the standards adopted by Title II of the ADA for State and local government services are generally the same as those required under section 504 of federally assisted programs and activities." *Henrietta D.*, 119 F. Supp. 2d at 206 (internal quotation omitted). Indeed, unless one of those subtle distinctions is pertinent to a particular case, we treat claims under the two statutes identically.

*Id.* at 272. To establish a violation of the anti-discrimination provisions of Section 504 or Title II, a plaintiff must demonstrate that:

> (1) he is a qualified individual with a disability; (2) the defendant is subject to one of the Acts; and (3) he was denied the opportunity to participate in or benefit from the defendant's services, programs, or

activities, or was otherwise discriminated against by the defendant because of his disability.[5]

*Disabled in Action v. Bd. of Elections in City of New York*, 752 F.3d 189, 196–97 (2d Cir. 2014) (quotation marks and citation omitted). "A plaintiff may base her discrimination claim on one of three theories of liability: disparate treatment, disparate impact, or failure to make a reasonable accommodation." *Davis v. Shah*, 2016 WL 1138768, at *22 (2d Cir. Mar. 24, 2016) (citation omitted). The plaintiffs here appear to rely solely on the defendants' alleged failure to make reasonable accommodations. *See* Pls.' Opp'n Br. at 28–30.

The State defendants concede that Robert is a qualified individual and that they are "public entities" subject to both statutes, although they dispute that state sovereign immunity has been abrogated under Title II, as discussed above. *See* State Defs.' Br. at 12. They argue, however, that the plaintiffs have failed to allege that Robert was denied reasonable accommodations. *Id.* at 12–15. Those arguments are unconvincing—the plaintiffs' reasonable accommodation claim is largely based on the defendants' failure to modify the "Code Red" procedures or to provide the supports requested by the plaintiff-parents on several occasions, all of which appear to have been readily within the power of the State defendants to provide. Accordingly, I **deny** the motion to dismiss the discrimination claim against the State defendants.

2. *Count Two – Integration Mandate*

The plaintiffs claim that the State defendants violated the ADA's "integration mandate" when they terminated Robert's care. The regulations implementing Title II of the ADA require a

---

[5] Some Second Circuit authority suggests that the plaintiffs must also allege "discriminatory animus or ill will" in order to make out a Title II claim for monetary damages against a state where the conduct at issue violates the Equal Protection Clause. *See Dean v. Univ. at Buffalo Sch. of Med. & Biomedical Scis.*, 804 F.3d 178, 194 (2d Cir. 2015). At this stage of the proceedings, the plaintiffs have at least arguably alleged that the defendants' failure to accommodate Robert was deliberate, intentional, and premised on his disabilities, and accordingly, there is no need to decide the issue; however, it may be raised again at the summary judgment stage.

"public entity [to] administer . . . programs . . . in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d). "[T]he most integrated setting appropriate to the needs of qualified individuals with disabilities" is a setting that "enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible." 28 C.F.R. pt. 35, App. A, p. 450 (1998). *See also* 29 U.S.C. § 794 and 28 C.F.R. § 41.51(d). In particular, the integration mandate requires that individuals with mental disabilities must be placed in community settings, rather than institutions, if: "[1] the State's treatment professionals have determined that community placement is appropriate, [2] the transfer from institutional care to a less restrictive setting is not opposed by the affected individual, and [3] the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities." *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 587 (1999). A plaintiff need not be currently institutionalized to allege a violation of the integration mandate; instead, the Second Circuit, deferring to the Department of Justice's interpretation of the integration mandate, has held that a "serious risk of institutionalization or segregation" is sufficient to make out a violation. *Davis v. Shah*, 2016 WL 1138768, at *25 (2d Cir. Mar. 24, 2016) (citation omitted). In order to plead a sufficient risk, the plaintiff must allege that "a public entity's failure to provide community services will *likely* cause a decline in health, safety, or welfare that would lead to the individual's eventual placement in an institution." *Id.* (quotation marks and citation omitted, emphasis in original).

The difficulty for the plaintiffs is that the integration mandate appears to be concerned with the general level of services made available to a plaintiff, rather than creating an entitlement to remain with one program in particular, and the plaintiffs have not alleged that the State defendants have actually changed the type or amount of services and funding available to Robert

in any way. The *Olmstead* Court was careful to assert that it was not holding that the ADA
requires a standard of care or level of benefits. *Olmstead*, 527 U.S. at 603 n.14. Instead, the
mandate only requires states to "adhere to the ADA's nondiscrimination requirement with
respect to the services they actually provide." *Id.* Accordingly, *Olmstead* violations are generally
found when a state changes the *level* of services and supports available to a particular plaintiff on
the basis of her disability—for instance, in *Olmstead* itself, the Court determined the integration
mandate was violated when Georgia determined that it would be too costly to allow the plaintiffs
access to community placements *at all*. *Olmstead*, 527 U.S. at 596–600; *see also Messier v.
Southbury Training Sch.*, 562 F. Supp. 2d 294, 345 (D. Conn. 2008) (finding violation where
state defendants' failed to evaluate plaintiffs for community placement or to effectuate
placements deemed appropriate at all). Conversely, plaintiffs who have invoked *Olmstead* to
avoid a transfer between equivalently restrictive institutions because of personal preference or to
seek additional funding to remain in a preferred residence have been unsuccessful. *See, e.g.*,
*M.D. ex rel. Davidson v. Dep't of Developmental Servs.*, 83 Mass. App. Ct. 463, 467 (2013)
(observing that *Olmstead* "has no real application to interinstitutional transfers"); *Leocata ex rel.
Gilbride v. Wilson-Coker*, 343 F. Supp. 2d 144, 155 (D. Conn. 2004), *aff'd sub nom. Leocata v.
Leavitt*, 148 F. App'x 64 (2d Cir. 2005) (rejecting plaintiff's claim that the mandate was violated
when the state did not provide funding to allow her to remain in her home); *see also Rodriguez v.
City of New York,* 197 F.3d 611, 619 (2d Cir. 1999) ("*Olmstead* does not . . . stand for the
proposition that states must provide disabled individuals with the opportunity to remain out of
institutions.").

   In the present case, the plaintiffs have not alleged either that the State defendants actually
changed the level of supports available to Robert or that his termination from Chapel Haven

effectively ended his ability to find community placement. In fact, during the hearing, they conceded that Robert has continued to live independently in his condominium, albeit without access to the Chapel Haven campus and with the help of what they believe to be a less optimal patchwork of service providers. That level of inconvenience does not trigger the integration mandate. Accordingly, I **grant** the State defendants' motion to dismiss the integration claim.

### 3. *Count Three – Retaliation under ADA / Rehabilitation Act*

The plaintiffs claim that the State defendants improperly retaliated against Robert by terminating his care after he asked for accommodations to protect himself from Client A. The elements that a plaintiff must plead to make out a prima facie claim of retaliation under either the ADA or the Rehabilitation Act are:

> (i) a plaintiff was engaged in protected activity; (ii) the alleged retaliator knew that plaintiff was involved in protected activity; (iii) an adverse decision or course of action was taken against plaintiff; and (iv) a causal connection exists between the protected activity and the adverse action.

*Weixel v. Bd. of Educ. of City of New York*, 287 F.3d 138, 148 (2d Cir. 2002), *superseded on other grounds by* 42 U.S.C. § 12102(3)(a). The State defendants argue that Robert has failed to meet the first and third elements of a retaliation claim.

With respect to the first element, requesting a "reasonable accommodation" of a plaintiff's disability constitutes protected activity. *Weixel*, 287 F.3d at 149. The State defendants concede that the plaintiffs' requests before August 6, 2014, when tensions between Robert and Client A came to a head, were for "reasonable accommodations." State Defs.' Br. at 18. They argue somewhat frivolously, however, that the accommodations the plaintiffs requested on August 21 were not for "accommodations," but rather for *additional* services. *Id.* First, that position is inconsistent—drawing all reasonable inferences in favor of the plaintiffs, it is clear that several of the requests made on August 21, including requests for assistance in keeping

Client A away from Robert and changes to the Code Red procedure, are identical to pre-August 6 requests. *Compare* Am. Compl. at ¶ 132 (August 21 requests), *with* ¶¶ 90, 97, 99 (pre-August 6 request for assistance keeping Client A away); ¶ 105 (pre-August 6 request for changes to Code Red procedures). Moreover, although one of the August 21 requests was for "additional support hours," the remainder included small changes in management clearly within the scope of the services already being provided to Robert.

With respect to the third element, the State defendants argue that although termination may constitute an adverse action, they were not responsible for making the termination decision. State Defs.' Br. at 19. As discussed above, I find that the plaintiffs' have adequately pleaded the State defendants' active involvement.

Accordingly, I **deny** the State defendants' motion to dismiss the retaliation claims. I note, however, that they may have a strong argument for an early summary judgment motion on those claims.

### 4. *Count Four – Freedom of Choice*[6]

The plaintiffs claim that the State defendants violated Robert's statutory right to receive services from the provider of his choice when they terminated his services at Chapel Haven. Section 1396a(a)(23) of the Medicaid Act, known as the "freedom of choice" provision, provides that:

> any individual eligible for medical assistance (including drugs) may obtain such assistance from any institution, agency, community pharmacy, or person, qualified to perform the service or services required (including an organization which provides such services, or arranges for their availability, on a prepayment basis), who **undertakes to provide him** such services . . . .

---

[6] The parties agree that Count Four asserts two distinct claims. I accordingly discuss those two claims separately.

(emphasis added). The plaintiffs assert that when the State Defendants approved Chapel Haven's termination of Robert's care,[7] they violated his right under that provision to receive services from the provider of his choice.

The State defendants argue that the phrase "undertakes to provide him with such services" limits the Medicaid recipient's choice to only those entities *willing* to provide him with services. *See* State Defs.' Br. at 24–26. They point to the implementing regulations for the provision, which state that, subject to exceptions that do not appear to be relevant here:

> a beneficiary may obtain Medicaid services from any institution, agency, pharmacy, person, or organization that is—
>
> (i) Qualified to furnish the services; and
>
> (ii) Willing to furnish them to that particular beneficiary.

42 C.F.R. § 431.51(b)(1). As the State defendants observe in their brief, when those regulations were amended in 1991, the Health Care Financing Administration ("HCFA") specifically explained the new language was intended to:

> counteract a misunderstanding that has arisen in the past: freedom of choice does not obligate a Medicaid provider to furnish services to every recipient. Within specified limits, a recipient may seek to obtain services from any qualified provider, but the provider determines whether to furnish services to the particular recipient. This is consistent with the language of § 1902(a)(23) of the Act; "* * * who undertakes to provide him such services.

56 Fed. Reg. 8835 (1991).

Several other courts interpreting the statute and regulation have adopted the State defendants' view. *See, e.g.*, *People First of Tennessee v. Clover Bottom Developmental Ctr.*, 753 F. Supp. 2d 701, 711 (M.D. Tenn. 2010) ("The qualified provider must be willing to furnish

---

[7] The State defendants also repeat their argument that they have not taken any action against Robert. *See* State Defs.' Br. at 23. For the reasons stated above, however, I reject that argument at this stage of the proceedings because the plaintiffs have adequately alleged that the State defendants were involved in the termination decision.

services to the recipient.") (citing 42 C.F.R. § 431.51(b)(1)); *Miller v. Gorski Wladyslaw Estate*, 547 F.3d 273, 281 n.7 (5th Cir. 2008) (same); *see also Hillburn by Hillburn v. Comm'r, Connecticut Dep't of Income Maint.*, 1985 WL 2364, at *14 (D. Conn. July 17, 1985) (holding that a Medicaid recipient "has no right to demand services from an unwilling provider or to demand that the state itself provide services to him"); *Gasper v. Dep't of Soc. & Health Servs.*, 132 Wash. App. 42, 58 (2006)*, aff'd in part, rev'd in part sub nom. Jenkins v. Washington State Dep't of Soc. & Health Servs.*, 160 Wash. 2d 287 (2007) ("[F]orcing a recipient to change caregivers or to physically relocate when the current care provider is no longer willing or qualified does not violate the choice of provider rules."). The most complete statement of that reasoning comes from *Rovner v. Keystone Human Services*, 2013 WL 4016490 (M.D. Pa. Aug. 6, 2013), which approvingly quoted the HCFA's explanation of the regulations to reject an argument similar to the one the plaintiffs made here:

> [A] provider  . . . cannot be compelled to continue providing services to a recipient if, at some point, the provider becomes unwilling to do so. In contrast to what this regulation plainly provides, the plaintiffs suggest that because [the provider] was at one time a willing provider of services, it was thereafter bound to continue providing the services to [the recipient] even if it later became unwilling to do so. This argument finds no support in the law.

*Id.* at *7.

The plaintiffs respond with a citation to *Catanzano v. Wing*, 992 F. Supp. 593 (W.D.N.Y. 1998). *See* Pls.' Opp'n Br. at 37. That case is distinguishable because it concerned state-actor providers seeking to invoke the "freedom of choice" provision in order to avoid a state-imposed obligation to provide care. *See id.* at 597. ("To the extent that 42 C.F.R. § 431.51(b)(1)(ii) can be read as allowing providers to refuse to accept patients *even in the face of an administrative decision to the contrary*, I find that it is based on an unwarranted and erroneous interpretation of the statute.") (emphasis added). The Second Circuit, in remanding the case to the district court,

had already made clear that the freedom of choice provision did not itself coerce unwilling

providers, and that the state's administrative order distinguished the *Catazano* case:

> It is true that the Health Care Financing Administration noted that
> "freedom of choice does not obligate a Medicaid provider to furnish
> services to every recipient." But the question in this case is not whether
> the freedom of choice law itself obligates the provider. **It clearly does
> not.** Rather, it is whether, in a situation in which the *state* has obligated
> the provider, the freedom of choice law renders that obligation invalid.

*Catanzano by Catanzano v. Wing*, 103 F.3d 223, 231–32 (2d Cir. 1996) (bolded emphasis added,

italicized emphasis original). And in the present case, there was no such state directive creating

an additional obligation.

The plaintiffs also invoke policy considerations, asserting that adopting the State

defendants' reading of the provision would allow providers to decline to provide services for

discriminatory reasons. *See* Pls.' Opp'n Br. at 38. The plaintiffs should be well aware from their

own complaint, however, that the Medicaid and Rehabilitation Acts both include *separate* anti-

discrimination provisions, and accordingly, there is no need to invent a duplicative protection.

By contrast, forcing providers to unwillingly provide services to Medicaid recipients could have

serious negative consequences, including a reduced number of providers taking part in the

program at all, and inadequate or inappropriate support to individual recipients from frustrated,

overworked, or otherwise unwilling caregivers.

Accordingly, I **grant** the State defendants' motion to dismiss the freedom of choice claim

in Count Four.

5. *Count Four – Fair Hearing*

The plaintiffs claim that the State defendants improperly denied Robert his statutory right

to a fair hearing before his termination was finalized. Section 1396a(a)(3) states that a State

Medicaid plan must "provide for granting an opportunity for a fair hearing before the State

25

agency to any individual whose claim for medical assistance under the plan is denied or is not

acted upon with reasonable promptness." The implementing federal regulations provide that

"[t]he State agency must grant an opportunity for a hearing to . . . [a]ny beneficiary who requests

it because he or she believes the agency has taken an action erroneously." 42 C.F.R. §

431.220(a)(2). The regulations define an "action" in relevant part as "a termination, suspension,

or reduction of Medicaid eligibility or covered services." 42 C.F.R. § 431.20.

     The State defendants argue that the plaintiffs had no such entitlement. In support of their

position, the State defendants appear to be arguing that the plaintiffs have failed to adequately

allege: (1) state action sufficient to meet the requirements of section 1983 claim; and (2) state

action sufficient to meet the requirements of the "action" requirement in the Medicaid Act and

implementing regulations. *See* State Defs.' Br. at 27–31.

     As discussed above, I have already determined that the plaintiffs have adequately alleged

that the State defendants engaged in state action through their participation in the termination

decision. To the extent that the State defendants are arguing that the state action alleged is

insufficient to trigger the *statutory* requirement for a fair hearing, however, their argument is

persuasive. First, the regulations defining "action" suggest that the term refers to changes in the

levels of Medicare funding available to the recipient *in general*, rather than more specific

decisions about where that funding goes. *See* 42 C.F.R. § 431.20 (defining action as "a

termination, suspension, or reduction of Medicaid eligibility or covered services"). That

distinction echoes the Integration Mandate discussion above—an agency "action" might include

a decision that certain *kinds* of services would not be covered at all, but not that certain providers

would no longer be available to a given recipient, unless that latter decision worked to *de facto*

eliminate a kind of treatment option entirely. Put another way, the definition of "action" leaves

open the possibility that a state agency could make decisions impacting a Medicaid recipient that do not trigger the "fair hearing" requirement, and that seems to be the case here.

The State defendants' reference to the distinction between direct and indirect benefits, as articulated in *O'Bannon*, is also instructive. *See* State Defs.' Br. at 27; *id.* at 20–23 (explaining the same concept in the context of the freedom of choice provision). In the course of interpreting the "freedom of choice" provision, the Supreme Court in *O'Bannon v. Town Court Nursing Center*, 447 U.S. 773 (1980), drew a distinction between direct and indirect benefits as follows:

> In the Medicare and the Medicaid Programs the Government has provided needy patients with both direct benefits and indirect benefits. The direct benefits are essentially financial in character; the Government pays for certain medical services and provides procedures to determine whether and how much money should be paid for patient care. The net effect of these direct benefits is to give the patients an opportunity to obtain medical services from providers of their choice that is comparable, if not exactly equal, to the opportunity available to persons who are financially independent. **The Government cannot withdraw these *direct* benefits without giving the patients notice and an opportunity for a hearing on the issue of their eligibility for benefits.**

*Id.* at 786–87 (emphasis added). That passage suggests that the "fair hearing" requirement is *only* triggered for state actions that affect direct benefits. *See also Rovner*, 2013 WL 4016490, at *6 (finding no right to fair hearing because, *inter alia*, the decision to discharge the recipient from one institution did not render the recipient generally "ineligible to receive residential and community-based services"). And because the plaintiffs conceded at the hearing that Robert continues to receive the same *kinds* of services, albeit, in their opinion, of a different quality—in other words, that he retained the ability to receive services from any *willing* provider of in-home and job supports—the termination decision did not affect any direct Medicaid benefits and the fair hearing requirement has not been triggered. Accordingly, I **grant** the State defendants' motion to dismiss the fair hearing claim in Count Four.

6.   *Count Five – Due Process*

The plaintiffs claim that the State defendants violated Robert's constitutional right to due process when they terminated his services with Chapel Haven. To state a claim under the Due Process clause of the Fourteenth Amendment, a plaintiff must allege: (1) the deprivation of a protected interest in life, liberty, or property; (2) by a state actor; (3) without the process that is due. *Mathews v. Eldridge*, 424 U.S. 319, 334–35 (1976); *Goldberg v. Kelly*, 397 U.S. 254, 261–63 (1970). The State defendants argue that the plaintiffs have shown neither a property interest nor a liberty interest.

a.   Property Interest

In order to have a property interest triggering due process rights, the plaintiff must show a "legitimate claim of entitlement" to the benefit. *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972). The *Roth* Court elaborated that:

> Property interests, of course, are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law— rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.

*Id.*

The State defendants accordingly argue that the plaintiffs have failed to identify the source of a legitimate entitlement to continue receiving services from a particular provider. The State defendants first argue that, like with the freedom of choice provision discussed above, there is no legitimate entitlement to receive services from an unwilling provider. *See* State Defs.' Br. at 33. The plaintiffs' response, citing to *Kelly Kare, Ltd. v. O'Rourke*, 930 F.2d 170 (2d Cir. 1991), and *O'Bannon* for the proposition that courts have recognized a property interest in receiving services from *any* qualified provider, *see* Pls.' Opp'n Br. at 42, is unconvincing. Both of those

28

cases were specifically focused on whether there was a property interest in receiving services from a provider that was no longer deemed "qualified." Accordingly, the court in each case identified the qualification of the provider as a *necessary*—rather than a sufficient—element of a "legitimate entitlement." *See O'Bannon*, 447 U.S. at 785 ("Appeals do not confer a right to continued residence in the home of one's choice. Title 42 U.S.C. § 1396a(a)(23) (1976 ed., Supp. II) gives recipients the right to choose among a range of *qualified* providers, without government interference.") (emphasis in original); *Kelly Kare*, 930 F.2d at 175 ("No cognizable property interest can arise in the Medicaid recipient *unless* the provider is both qualified and participating in the Medicaid program.") (emphasis added). As discussed above, the statute's requirement that the providers be "willing" is a limitation on the same footing as the requirement that they be qualified. *See* 42 C.F.R. § 431.51(b)(1).

Second, the State defendants argue that there is no other source of entitlement creating a property interest. *See* State Defs.' Br. at 33–40. In particular, the State defendants correctly point out that the agreement between Chapel Haven and DDS, at best, conditions the termination decision on a procedural review.[8] *See* State Defs.' Br., Ex. B at 16 (doc. 34-4 at 67) [hereinafter "Agreement"] ("The contractor shall comply with the following requirements: . . . (f) Permanent Transfers. Prior approval by PRAT and a new CSA is required to permanently transfer a Participant from one residential setting to another."); *see also Bishop v. Wood*, 426

---

[8] The State defendants correctly point out that the plaintiffs have not argued that they were third-party beneficiaries of that agreement; however, I assume for the sake of argument that the agreement between Chapel Haven and DDS was intended to implement the Medicaid statute for the benefit of care-recipients. *See Gateway Co. v. DiNoia*, 232 Conn. 223, 231 (1995) (whether a contract creates third-party beneficiary status determined by whether it was intended to create a direct obligation to the third party); *see also New York City Health & Hosps. Corp. v. WellCare of New York, Inc.*, 801 F. Supp. 2d 126, 134 (S.D.N.Y. 2011) (observing generally that whether a plaintiff is a third-party beneficiary of a government contract is generally governed by the same considerations as whether the plaintiff has a private right of action under a statute mandating said contract).

The State defendants also argue at length that the Medicaid Waiver agreement cannot confer any entitlements on Robert as a beneficiary. *See* State Defs.' Br. at 36–40. Because the plaintiffs make no effort to identify any specific individual rights conferred in that agreement, however, I see no need to reach those arguments.

Finally, the plaintiffs invoke a third source—the Chapel Haven community member handbook—however, there is no plausible argument that the Handbook creates obligations on the part of the *State* Defendants.

U.S. 341, 345 (1976) (distinguishing between a property interest in continued employment and "mere" procedural rights before termination); *Sealed v. Sealed*, 332 F.3d 51, 57 (2d Cir. 2003), *certified question answered sub nom. Teresa T. v. Ragaglia*, 272 Conn. 734 (2005) ("We emphasize that such *procedures*, standing alone, create no independent *substantive* entitlements, whose deprivation might trigger application of the Due Process Clause.") (collecting cases). Moreover, although the plaintiffs allege that they did not receive the exact process specified— namely, the interdisciplinary team review—they did have several functionally equivalent opportunities to challenge the termination decision, including the Programmatic Administrative Review held on October 1, 2014. Am. Compl. at ¶ 149.

Accordingly, I **grant** the State defendants' motion to dismiss the due process claim to the extent it is based on a property interest.

b.   Liberty Interest

What constitutes a liberty interest is broadly defined, and includes:

> not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized as essential to the orderly pursuit of happiness by free men.

*Roth*, 408 U.S. at 572 (internal quotation, alteration, and citation omitted). Although some courts have recognized that "transfer trauma" may be so severe in some cases that it severely limits an individual's autonomy, *see, e.g.*, *Yaretsky v. Blum*, 629 F.2d 817, 821 (2d Cir. 1980), *rev'd on other grounds,* 457 U.S. 991 (1982), the plaintiffs have not squarely alleged such trauma in the present case. Moreover, it is unclear whether the decision to permit a single provider to terminate its services to Robert would have a sufficiently "direct" impact on Robert's liberty such that it constituted a *state* deprivation of his liberty interests. *See Kelly Kare, Ltd. v. O'Rourke*, 930 F.2d

170, 178 (2d Cir. 1991) ("[S]tate action that incidentally burdens an indirect governmental

benefit [namely, freedom of choice] does not rise to the level of a deprivation of a liberty

interest."). Accordingly, I **grant** the State defendants' motion to dismiss the due process claim to

the extent it is based on a liberty interest.

E. Chapel Haven Defendants' Rule 12(b)(6) Motion (doc. 32)

1. *Count One – Claims under Title II of the ADA*

The plaintiffs claim that the Chapel Haven defendants improperly discriminated against

Robert on the basis of his disability. The Chapel Haven defendants move to partially dismiss the

claims against them in Count One for violations of Title II of the ADA. They argue that Chapel

Haven is not a "public entity," which is an element of a Title II claim, but rather a "private

entity" subject to Title III. *See* Chapel Haven Defs.' Br. at 3–6. The ADA specifically establishes

"public entities" and "private entities" as mutually exclusive categories: "The term "private

entity" means any entity other than a public entity . . . ." 42 U.S.C. § 12181(6). The plaintiffs

appear to concede the point by stating: "The State Defendants are subject to Title II of the ADA,

42 U.S.C. § 12131(1), and Chapel Haven is subject to Title III." Pls.' Opp'n Br. at 26.

Accordingly, I **grant** the Chapel Haven defendants' motion to dismiss the Title II claims against

them. I note that Chapel Haven does not move to dismiss the remaining Title III or

Rehabilitation Act claims in that count.

2. *Count Two – Integration Mandate*

The plaintiffs assert that the Chapel Haven defendants violated the integration mandate in

the ADA and the Rehabilitation Act, as articulated by the Supreme Court in *Olmstead.* Assuming

that the integration mandate articulated in Title III of the ADA or in the Rehabilitation Act,

which are substantially similar to the mandate discussed above in Title II, could impose liability

on a private entity, I nevertheless hold that, as discussed above with respect to the State

defendants, the plaintiffs have failed to plausibly allege that Chapel Haven's termination of

Robert created a "substantial risk" of institutionalization or segregation—they have not, for

instance, alleged that Chapel Haven is the only community placement program available such

that termination would necessarily result in institutionalization. Thus, I **grant** the Chapel Haven

defendants' motion to dismiss the integration mandate claims.

### 3.   *Count Four – Freedom of Choice*

The plaintiffs claim that the Chapel Haven defendants violated Robert's statutory right to

receive services from the provider of his choice when they terminated his services at Chapel

Haven. The Chapel Haven defendants argue that the claims brought against them under the

freedom of choice provision through section 1983 should be dismissed on the grounds that they

are not "state actors" and that the provision does not create a right to choose unwilling providers.

Even if Chapel Haven is a "state actor," however, for the reasons discussed above with respect to

the State defendants, the freedom of choice provision does not confer a right to choose unwilling

providers. *See Catanzano by Catanzano v. Wing*, 103 F.3d 223, 231–32 (2d Cir. 1996). I thus

**grant** the motion to dismiss the freedom of choice claim.

### 4.   *Count Four – Fair Hearing*

The plaintiffs claim that the State defendants improperly denied Robert his statutory right

to a fair hearing before his termination was finalized. The Chapel Haven defendants argue that

the claims brought against them under the fair hearing provision through section 1983 should be

dismissed on the grounds that they are not "state actors" and had no role whatsoever in

determining whether a hearing should be held. Even if Chapel Haven was a state actor, however,

for the reasons discussed above with respect to the State defendants, the fair hearing provision

was not triggered by the decision to remove Robert from Chapel Haven, because that decision

did not affect his "direct" statutory benefits. *See O'Bannon v. Town Court Nursing Center*, 447

U.S. 773, 787 (1980). I thus **grant** the motion to dismiss the fair hearing claim.

    5.   *Count Five – Due Process*

The plaintiffs claim that the Chapel Haven defendants, acting as the agents of the State,

violated Robert's constitutional right to due process when they terminated his services. That

claim must fail for the same reasons as did the claim against the State defendants, discussed

above.

Separately, to the extent that the due process claim is premised on any other action taken

by the Chapel Haven defendants, including through misrepresentations in the Chapel Haven

community handbook, or its decision to "ex parte" contact DDS and provide allegedly false

information, the plaintiffs have not adequately alleged state participation in those decisions such

that state action can be found. Accordingly, I **grant** the motion to dismiss the due process claim.

    6.   *Count Eight – Promissory Estoppel*

The plaintiffs bring a claim under the doctrine of promissory estoppel, alleging that they

relied on the Chapel Haven defendants' repeated promises to provide Robert with "lifelong care"

when they purchased a condominium for him in close proximity to the Chapel Haven campus.

The Connecticut Supreme Court has adopted the position of the Restatement (Second) of

Contracts on promissory estoppel as follows:

> Section 90 of the Restatement [(Second) of Contracts] states that under the
> doctrine of promissory estoppel [a] promise which the promisor should
> reasonably expect to induce action or forbearance on the part of the
> promisee or a third person and which does induce such action or
> forbearance is binding if injustice can be avoided only by enforcement of
> the promise. [1 Restatement (Second), Contracts § 90, p. 242 (1981).]

*Stewart v. Cendant Mobility Servs. Corp.*, 267 Conn. 96, 104 (2003) (quoting *D'Ulisse-Cupo v. Board of Directors of Notre Dame High School*, 202 Conn. 206, 213 (1987)). In Connecticut, "[a] fundamental element of promissory estoppel, therefore, is the existence of a clear and definite promise which a promisor could reasonably have expected to induce reliance." *Id.* at 104–05 (quoting *D'Ulisse-Cupo*, 202 Conn. at 213). "Additionally, the promise must reflect a present intent to commit as distinguished from a mere statement of intent to contract in the future." *Id.* at 105.

The Chapel Haven defendants argue that the plaintiffs have failed to allege: (1) a sufficiently "clear and definite promise;" or (2) that any such promise did actually "induce" the plaintiffs to purchase the condo; and they further argue that (3) enforcement of an alleged promise to provide Robert with "lifelong care" would be inequitable and inappropriate. *See* Chapel Haven Defs.' Br. at 14–15. They are correct that the plaintiffs' failure to allege a sufficiently clear promise is fatal to this count. Most of the relevant allegations in the amended complaint are too vague to support a promissory estoppel claim—at best, they establish that Chapel Haven markets itself as having the *ability* to provide lifelong care, rather than committing itself to provide such care for any particular recipient. *See, e.g.*, Am. Compl. at ¶ 18 ("Chapel Haven affirmatively represented and promised to Plaintiffs and others that they young adult children with intellectual disabilities would . . . be[] able to access the wide array of services they would need as they age."); ¶ 22 ("Chapel Haven markets itself . . . as 'unique' and offering lifelong and individualized services."); ¶ 60 ("Chapel Haven is committed to providing a *lifelong* program of individualized support services . . . .") (emphasis in complaint). The plaintiffs come closer to alleging a specific promise where they state that, at an unspecified time, "Chapel Haven . . . agreed to support Robert as he grew older," but the remainder of that paragraph again

34

suggests that promise referred to Chapel Haven's *ability* to provide lifelong care. *See id.* at ¶ 61. Moreover, to the extent that the plaintiffs could further amend their complaint to allege a more specific statement of commitment, the reasonableness of relying on such a promise is clearly undermined by provisions of the Member Handbook explaining how termination decisions are made, *see id.* at ¶ 65., a clear indication that lifelong participation in the program was not guaranteed.

In light of the plaintiffs' awareness that Robert was not entitled to receive services from Chapel Haven no matter the circumstances, the promissory estoppel claim may be better understood as an attempt to enforce the Chapel Haven defendants' agreement to provide services to Robert *unless* one of the enumerated reasons for termination included in the Handbook applied. But a version of that claim is already included in the breach of contract claim, which the Chapel Haven defendants do not contest. Thus, because there appears to be a *legal* remedy for the violation alleged here, there is no need to allow a duplicative equitable remedy. Accordingly, I **grant** the motion to dismiss the promissory estoppel claim.

### 7.   *Count Nine – Specific Performance*

The plaintiffs seek "specific performance" of the "unique" services provided by Chapel Haven, by which they appear to mean reinstatement in the program, the ability to work with Williams, Robert's long-time care provider, and the ability to receive job supports that would enable Robert to return to the Naval Base. As discussed at the hearing, specific performance is a potential remedy for the plaintiffs' breach of contract claim and does not need to be pleaded as a

separate count. Accordingly, I **grant** the motion the motion to dismiss the specific performance claim, although it remains available as a potential remedy.[9]

    8.  *Count Ten – Fiduciary Duty*

The plaintiffs claim that by arbitrarily terminating Robert's services, the Chapel Haven defendants breached their fiduciary duty of care to him. "The essential elements to pleading a cause of action for breach of fiduciary duty under Connecticut case law are:

> (1) That a fiduciary relationship existed which gave rise to (a) a duty of loyalty on the part of the defendant to the plaintiff, (b) an obligation on the part of the defendant to act in the best interests of the plaintiff, and (c) an obligation on the part of the defendant to act in good faith in any matter relating to the plaintiff; (2)That the defendant advance[d] his own interests to the detriment of the plaintiff; (3) That the plaintiff sustained damages; (4) That the damages were proximately caused by the fiduciary's breach of his or her fiduciary duty.

*AW Power Holdings, LLC v. FirstLight Waterbury Holdings, LLC*, 2015 WL 897785, at *4 (Conn. Super. Ct. Feb. 17, 2015) (internal quotation marks and citation omitted). Several categories of relationship carry a presumption of fiduciary responsibility, including "agents, partners, lawyers, directors, trustees, executors, receivers, bailees and guardians." *Iacurci v. Sax*, 313 Conn. 786, 800 (2014) (internal quotation marks and citations omitted). If the relationship at issue falls outside of those *per se* categories, the Connecticut Supreme Court has endorsed "a flexible approach [to] determine[] the existence of a fiduciary duty, which allows the law to adapt to evolving situations wherein recognizing a fiduciary duty might be appropriate." *Id.* In that case, Connecticut courts consider whether the relationship at issue has the essential characteristics of a fiduciary relationship, which include "a unique degree of trust and confidence

---

[9] I note, however, that Connecticut courts have a longstanding policy of refusing to specifically enforce personal services contracts. *See Lark v. Post-Newsweek Stations, Connecticut, Inc.*, 1994 WL 684718, at *6 (Conn. Super. Ct. Nov. 28, 1994) (collecting cases dating back to 1890).

between the parties, one of whom has superior knowledge, skill or expertise and is under a duty to represent the interests of the other." *Id.* (internal quotation marks and citation omitted).

As the *Iacurci* Court explains, "the imposition of a fiduciary duty counterbalances opportunities for self-dealing that may arise from one party's easy access to, or heightened influence regarding, another party's moneys, property, or other valuable resources." *Id.* at 1155; *see also id.* at 1154 ("The superior position of the fiduciary or dominant party affords him great opportunity for abuse of the confidence reposed in him.") (quoting a classic and much repeated statement on fiduciary relationships in Connecticut courts). Thus, one can understand the characteristics identified by the Connecticut courts as proxy for the key question—not whether there is a weaker and a stronger party or an obligation to act in good faith generally, but whether the relationship inherently carries an untenable risk of abuse.

In keeping with that reasoning, most of the cases cited by the plaintiffs, the imposition of a fiduciary duty was premised on the risk that one party would otherwise be able to take unfair advantage of the other for its own gain. Accordingly, it appears that in each case, the court's determination that there was a fiduciary relationship was closely tied to the nature of the parties' relationship and the breach alleged. *See, e.g.*, *Johnson v. Schmitz*, 119 F. Supp. 2d 90, 97–98 (D. Conn. 2000) (finding a fiduciary relationship between a graduate student and advisor where advisor misappropriated the former's work for personal gain); *Jarvis v. Lieder*, 117 Conn. App. 129, 146 (2009) (finding fiduciary relationship where defendants had control of and abused plaintiff's financial affairs); *Berty v. Gorelick*, 59 Conn. App. 62, 68 (2000) (finding fiduciary relationship where defendant had control over grandmother's financial affairs and, *inter alia*, forged checks); *see also Gordon v. Bialystoker Ctr. & Bikur Cholim, Inc.*, 45 N.Y.2d 692, 698 (1978) (finding fiduciary relationship where defendant-nursing home used control over

plaintiff's finances to make a gift to the home). *But see Petre v. Living Centers-E., Inc.*, 935 F. Supp. 808, 810 (E.D. La. 1996) (imposing a general fiduciary duty on a nursing home, which it found was breached by providing inadequate care).

Applying those principles, contrary to most of the Chapel Haven defendants' arguments, one can easily imagine contexts where Chapel Haven and its staff had a fiduciary duty to Robert—for instance, when Williams took Robert shopping, she likely had a special duty to use his funds appropriately to pay for groceries, rather than pocketing them or buying things for herself. But contrary to the plaintiffs' arguments, it does not therefore follow that Chapel Haven had a fiduciary duty to Robert in *every* context. For instance, the court's statement in *Johnson v. Schmitz*, 119 F. Supp. 2d 90 (D. Conn. 2000), is suggestive of a similarly limited fiduciary obligation:

> Given the collaborative nature of the relationship between a graduate student and a dissertation advisor who necessarily shares the same academic interests, the Court *can envision a situation* in which a graduate school, knowing the nature of this relationship, may assume a fiduciary duty to the student.

*Id.* at 97–98 (emphasis added). Presumably the finding that there is a fiduciary duty between the university or the advisor with respect to the student's thesis work does not mean that the university now also has a special duty of care in *all* of its dealings with that student; instead, the implication is that the duty has been imposed specifically to prevent the advisor and his employer from taking unfair professional advantage of the student's trust.

The plaintiffs identify the breach of duty as the termination decision, which they allege was improperly motivated by a financial conflict of interest on Chapel Haven's part—they claim that Robert was terminated in order to preserve Chapel Haven's ability to collect greater fees from Client A. But although Robert did depend heavily on the Chapel Haven defendants for care and protection day-to-day, it is not clear how his relationship with them conferred the

38

opportunity for self-dealing *through an arbitrary termination*. The relationship between Chapel

Haven and Robert exacerbated the harm caused by that decision, but it did not specifically

provide Chapel Haven with the opportunity to engage in self-dealing; accordingly, to the extent

that there is a fiduciary relationship between Robert and the Chapel Haven defendants in some

contexts, it was not breached here.

The plaintiffs may be arguing more generally that because decisions made by entities that

provide care to the mentally disabled have such an outsize impact on the recipients of their

services, those entities owe a special duty to make all such decisions with care and a bias towards

the needs of the recipient. *See Petre*, 935 F. Supp. at 810 (using that reasoning to impose a

general fiduciary duty on a nursing home, which it found was breached by providing inadequate

care). That argument does not, however, seem appropriate for a fiduciary duty claim. First,

imposing a heightened duty on an entire industry is a task for the legislature or, at least, the

Connecticut Supreme Court—as discussed above, Connecticut already has a list of "per se"

fiduciary relationships, not including care providers. Second, the foreseeable harms caused by an

allegedly arbitrary and capricious termination of services are already addressed through several

of the other causes of action raised in this complaint, including the breach of contract and the

implied covenant claims, and the negligent infliction of emotional distress claim. Accordingly, I

**grant** the motion to dismiss the breach of fiduciary duty claim.

### 9.   *Count Twelve – Discrimination Based on Source of Income*

The plaintiffs claim that the Chapel Haven defendants improperly discriminated against

Robert on the basis of his source of income when they favored Client A over him. The Chapel

Haven defendants move to dismiss this claim on the grounds that the statute under which it is

brought, Conn. Gen. Stat. § 46a-64, does not provide a private right of action, or alternatively,

only provides a right of action after the plaintiff files an administrative complaint with the

Connecticut Commission on Human Rights and Opportunities ("CHRO"). *See* Chapel Haven

Defs.' Br. at 20–23; *id.* at 23 n.9 (citing *Green v. DGG Properties Co.*, 2013 WL 395484, at *9

(D. Conn. Jan. 31, 2013)). The plaintiffs admit they did not file a complaint with the CHRO, and

concede that this count should be dismissed. *See* Pls.' Opp'n Br. at 55 n.22. Accordingly, I **grant**

the motion to dismiss this claim.

          10. *Count Thirteen – Intentional Infliction of Emotional Distress*

        The plaintiffs claim that events leading up to Robert's termination and the manner in

which his services were terminated were calculated by the Chapel Haven defendants to

intentionally inflict emotional distress upon him. In Connecticut, in order to make out a claim of

intentional infliction of emotional distress ("IIED"), the plaintiff must allege:

> (1) that the actor intended to inflict emotional distress or that he knew or
> should have known that emotional distress was the likely result of his
> conduct; (2) that the conduct was extreme and outrageous; (3) that the
> defendant's conduct was the cause of the plaintiff's distress; and (4) that
> the emotional distress sustained by the plaintiff was severe.

*Appleton v. Bd. of Educ. of Town of Stonington*, 254 Conn. 205, 210 (2000). In order to meet the

"extreme and outrageous" element, the conduct must "exceed[] all bounds usually tolerated by

decent society." *Id.* As the Connecticut Supreme Court explained:

> "Liability has been found only where the conduct has been so outrageous
> in character, and so extreme in degree, as to go beyond all possible bounds
> of decency, and to be regarded as atrocious, and utterly intolerable in a
> civilized community. Generally, the case is one in which the recitation of
> the facts to an average member of the community would arouse his
> resentment against the actor, and lead him to exclaim, 'Outrageous!' " 1
> Restatement (Second), Torts § 46, comment (d), p. 73 (1965). "Conduct
> on the part of the defendant that is merely insulting or displays bad
> manners or results in hurt feelings is insufficient to form the basis for an
> action based upon intentional infliction of emotional distress." *Mellaly v.
> Eastman Kodak Co.,* 42 Conn. Supp. 17, 19, 597 A.2d 846 (1991).

*Id.* at 10–11. Courts have taken the specific characteristics of the plaintiff into account in determining whether conduct meets the "outrageous" requirement. *See, e.g.*, *Doe v. Darien Bd. of Educ.*, 2009 WL 369918, at *10 (D. Conn. Feb. 11, 2009) (denying motion to dismiss IIED claim in part because the plaintiffs were "vulnerable").

The plaintiffs have enumerated eleven acts[10] in their IIED claim: (1) and (2) failing to stop Client A's harassment and holding Robert responsible for said harassment; (3) refusing to modify the Code Red system; (4) and (8) refusing to provide reasonable accommodations and holding Robert responsible for that refusal; (5), (6), and (10) terminating Robert's services without adequate warning; (9) breaching the PAR agreement to provide accommodations; (11) continuing to provide services to Client A; and (12) making defamatory statements about Robert. Am. Compl. at ¶ 301.

One can view the plaintiffs' list of misconduct individually or as a persistent course of conduct. Individually, most of the incidents listed amount to little more than allegations that Chapel Haven mismanaged Robert's situation. The strongest individual allegation is that the Chapel Haven defendants terminated Robert's care suddenly, without any urgent need, and without providing a transition plan, an action they should have known would have caused severe distress to a mentally disabled person who relied on their consistent care. Other allegations in the complaint, however, confuse that time-line—it is unclear whether, when the Plaintiffs complain about being given only 24-hours' notice of the termination decision, they are referring to the initial termination decision on August 27, 2014, the decision following the PAR on October 2, 2015, or the final termination in August 2015. And without providing that specificity, the plaintiffs have not plausibly alleged that Robert's services did, in fact, come to such an abrupt and traumatic end.

---

[10] Although acts are numbered up to 12, there is no number 7.

The plaintiffs may alternatively be portraying all of the enumerated incidents as part of a persistent campaign to target and harass Robert and force him out of the facility in order to protect Client A's continued membership. Although such a campaign, if adequately alleged, might be sufficiently "outrageous" when perpetrated against a mentally disabled person, I do not think that one has been adequately alleged in this complaint. Accordingly, I **grant** the Chapel Haven defendants' motion to dismiss Robert's IIED claim.

11. *Count Fourteen – Negligent Infliction of Emotional Distress*

The plaintiffs claim that the Chapel Haven defendants negligently inflicted emotional distress upon Robert during events leading up to Robert's termination and through the manner in which his services were terminated. In Connecticut, in order to state a claim for negligent infliction of emotional distress ("NIED"), the plaintiff must show:

> (1) the defendant's conduct created an unreasonable risk of causing the plaintiff emotional distress; (2) the plaintiff's distress was foreseeable; (3) the emotional distress was severe enough that it might result in illness or bodily harm; and (4) the defendant's conduct was the cause of the plaintiff's distress.

*Carrol v. Allstate Ins. Co.*, 262 Conn. 433, 444 (2003).

The Plaintiffs' list of alleged misconduct here is the same as for the IIED claim above; however, because the NIED standard requires only that the defendants' conduct created a foreseeable and unreasonable risk of severe emotional distress, Robert's negligent infliction claim is much stronger. As the Plaintiffs point out, they have alleged that Chapel Haven was well-aware of Robert's condition and his emotional fragility, and they have further alleged that Chapel Haven employees made inappropriate demands on him in the form of the unmodified Code Red system and confronted him directly instead of contacting his parents, despite knowing those actions would likely cause him great distress. *See, e.g.*, Am. Compl. at ¶¶ 127–28

(describing call from Sunny Richards to Robert). Although that conduct may not meet the "outrageous" element of an IIED claim, it plausibly could meet the requirements of an NIED claim. Accordingly, I **deny** the Chapel Haven defendants' motion to dismiss Robert's NIED claim.

12. *Count Fifteen – Connecticut Unfair Trade Practices Act*

Finally, the plaintiffs claim that some or all of the Chapel Haven defendants' conduct also violated the Connecticut Unfair Trade Practices Act. The Connecticut Unfair Trade Practices Act (CUTPA), Conn. Gen. Stat. § 42-110a *et seq.*, provides a private cause of action to "[a]ny person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a method, act or practice prohibited by section 42–110b . . . ." Conn. Gen. Stat. § 42–110g(a). Section 42–110b(a) provides that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." The Chapel Haven defendants contend that CUTPA does not apply to Chapel Haven because it was not engaged in "trade or commerce," or alternatively that the Plaintiffs' allegations do not make out an "unfair or deceptive act."

Trade or commerce is defined under CTUPA as "the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value in this state." *Id.* § 42–110a(4). The Chapel Haven defendants rely on courts' distinction between claims that implicate the "entrepreneurial or business aspect" of providing care, to which CUTPA may apply, and those that complain about medical competence or other professional determinations, to which it does not. *See* Chapel Haven Defs.' Br. at 29 (citing *Sherwood v. Danbury Hosp.*, 252 Conn. 193, 213 (2000), and *Haynes v. Yale-New Haven Hospital*, 243 Conn.

17, 32 (1997)). They discuss three cases in which Connecticut courts dismissed CUTPA claims

on the basis of that distinction: first, in *Walsh v. Abbott Terrace Health Ctr., Inc.*, 2000 WL

1429424 (Conn. Super. Ct. Sept. 18, 2000), the court dismissed CUTPA claims based on the

defendant-hospital's failure to properly monitor and treat the plaintiff's violent roommate. *Id.* at

*4.  Second, in *Johnson v. Schmitz*, 119 F. Supp. 2d 90 (D. Conn. 2000), the court dismissed

CUTPA claims against a university and professors accused of stealing a graduate student's work

because the plaintiff conceded that the defendants "were not motivated directly by financial

forces" but instead alleged that the acts were committed in the course of academic research and

publication. *Id.* at 103. Finally, in *King v. Stetson Sch., Inc.*, 2001 WL 58391 (Conn. Super. Ct.

Jan. 4, 2001), the court dismissed CUTPA claims against an operator of a residential facility for

the care of sexually abused children based on the defendant's failure to provide adequate care

and supervision. *Id.* at *5.

　　Some of the allegations supporting the plaintiffs' CUTPA claim in the present case can

be dismissed because, like the cases discussed above, they raise only "professional negligence"

claims—for instance, the claims that Chapel Haven failed to adequately monitor relationships

between recipients or to have a licensed behaviorist on staff. *See* Am. Compl. at ¶ 313.

Moreover, contrary to the plaintiffs' assertions that such claims are limited to medicine and law,

*Johnson* and *King* made clear that the "professional negligence" doctrine established in

*Sherwood* and *Haynes* may be analogically extended beyond those fields.

　　On the other hand, the plaintiffs also allege, as incorporated by reference, that Chapel

Haven's termination of Robert *was* motivated by financial forces—namely, the desire to retain

the higher-paying Client A as a recipient of their care. *See* Am. Compl. at ¶¶ 291–95

(incorporated in Count Fifteen at ¶ 310). Although that act may have been conducted in the

course of "trade or commerce," however, it does not meet the "unfairness" element of a CUTPA claim. The Connecticut Supreme Court uses three factors to determine whether a practice is "unfair" within the meaning of the statute:

> (1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers. . . .

*See Harris v. Bradley Memorial Hospital & Health Center, Inc.*, 296 Conn. 315, 350 (2010). A practice may be considered unfair if it meets one of the criteria to a great degree or meets multiple criteria to a lesser extent. *Id.* at 351. The practice of preferring higher paying customers, however, meets none of those criteria—indeed, for better or worse, it is the cornerstone of many businesses.

The Chapel Haven defendants also correctly argue that the allegations involving the breach of contract and any misrepresentation claims fail to include the "significant aggravating circumstances" generally required to convert a contractual dispute into a "deceptive or unfair" practice susceptible to a CUTPA claim. *See Hart v. World Wrestling Entm't, Inc.*, 2012 WL 1233022, at *11 (D. Conn. Apr. 10, 2012) (quotation marks and citation omitted).

Finally, the plaintiffs' effort to convert their defamation claim into a CUTPA claim, *see* Am. Compl. at ¶ 314,  also must fail because the allegedly defamatory statements were made to a state administrative agency, and accordingly were neither made in the course of trade or commerce, nor in a manner likely to mislead *consumers. See Edwards v. N. Am. Power & Gas, LLC*, 120 F. Supp. 3d 132, 141 (D. Conn. 2015) (observing that a deceptive act under CUTPA must be aimed at consumers). Accordingly, I **grant** the motion to dismiss the CUTPA claim.

IV.     **Conclusion**

        In conclusion, the defendants' motions to dismiss are **granted in part and denied in part**. (docs. 32 and 34) The motions to dismiss all of the claims asserted by the plaintiff-parents on their own behalf are **granted** without prejudice to amending within thirty days of this Order.

        With respect to the State defendants, their motions to dismiss Count Two (violation of the integration mandate); Count Four (violation of the free choice and fair hearing provisions); and Count Five (violation of due process) are **granted**. Their motions to dismiss Count One (violation of the ADA and Rehabilitation Act anti-discrimination provisions) and Count Three (violation of the ADA and Rehabilitation Act retaliation provisions) are **denied**.

        With respect to the Chapel Haven defendants, their motions to dismiss a portion of Count One (violation of the anti-discrimination provision in Title II of the ADA); Count Two (violation of the integration mandate); Count Four (violation of free choice and fair hearing provisions); Count Five (violation of due process); Count Eight (promissory estoppel); Count Nine (specific performance as a separately pleaded cause of action); Count Ten (breach of fiduciary duty); Count Twelve (income-based discrimination in violation of section 46a-64); Count Thirteen (intentional infliction of emotional distress); and Count Fifteen (CUTPA) are **granted**. Their motion to dismiss Count Fourteen (negligent infliction of emotional distress) is **denied**.

        The defendants pending motions to dismiss the plaintiffs' initial complaint are **denied as moot**. (docs. 25 and 26)

        Thus, either because they survived both motions to dismiss or because they were not challenged, the following counts remain: against the State defendants, Counts One and Three; and against the Chapel Haven defendants, Count One (under Title III), and Counts Three, Six, Seven, Eleven, and Fourteen. The parent-plaintiffs are also ordered to inform the court within thirty days of this Order **which parent will be the "primary" decision-maker** on Robert's

46

behalf in the context of this case. The parties are also ordered to provide **a proposed scheduling order** governing discovery and the filing of summary judgment motions to the court within thirty days of this Order.

       So ordered.

Dated at Bridgeport, Connecticut, this 1st day of March 2017.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge
